[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 8, 2003
THOMAS K. KAHN
CLERK

No. 02-12797

D. C. Docket No. 01-10024-CR-SH

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

RODCLIFFE HUGH MCPHEE,

Defendant-Appellant.

Appeal from the United States District Court
for the Southern District of Florida

**(July 8, 2003)**

Before CARNES, MARCUS and SUHRHEINRICH[*], Circuit Judges.

MARCUS, Circuit Judge:

Rodcliffe Hugh McPhee ("McPhee") appeals his 57-month sentence

imposed upon his conviction for conspiracy to possess with intent to distribute

---

[*]Honorable Richard F. Suhrheinrich, United States Circuit Judge for the Sixth Circuit, sitting by designation.

100 kilograms or more of marijuana, while on board a vessel subject to the jurisdiction of the United States, in violation of the Maritime Drug Law Enforcement Act ("MDLEA"), 46 U.S.C. app. § 1903(j). McPhee entered a conditional plea of guilty to Count One of a two-count indictment, expressly reserving the right to appeal the district court's denial of his motion to dismiss the indictment under Fed. R. Crim. P. 11(a)(2).[1] On appeal, McPhee raises only the issue of whether the district court erred in finding that the vessel Notty was subject to the jurisdiction of the United States under § 1903. After thoroughly reviewing the record and the parties' briefs, we conclude that the district court did not err in finding that the Notty was a vessel subject to the jurisdiction of the United States, and accordingly affirm.

---

[1]Fed. R. Crim. P. 11(a)(2) provides:

> With the consent of the court and the government, a defendant may enter a conditional plea of guilty or nolo contendere, reserving in writing the right to have an appellate court review an adverse determination of a specified pretrial motion. A defendant who prevails on appeal may then withdraw the plea.

Fed. R. Crim. P. 11(a)(2).

McPhee's plea agreement states in pertinent part: "The defendant is entering a conditional guilty plea pursuant to Federal Rule of Criminal Procedure 11(a)(2), whereby he expressly reserves the right to appeal the district court's adverse ruling on the defendant's motion to dismiss the indictment for lack of subject matter jurisdiction."

Generally, the district court's denial of a motion to dismiss an indictment is reviewed only for an abuse of discretion. See United States v. Noriega, 117 F.3d 1206, 1211 (11th Cir. 1997). However, we review de novo the district court's interpretation and application of the statutory provisions concerning the court's subject matter jurisdiction, and review for clear error the district court's factual findings with respect to jurisdiction. See United States v. Tinoco, 304 F.3d 1088, 1114 (11th Cir. 2002), cert. denied sub nom., Hernandez v. United States, _ U.S. _, 123 S. Ct. 1484, 155 L. Ed. 2d 231 (2003).

The relevant facts are straightforward. On May 1, 2001, the United States Coast Guard Cutters Bear and Tampa, which had been conducting law enforcement surveillance in an area of the Caribbean Sea between eastern Cuba and the Bahamas, maneuvered into position to intercept a go-fast vessel named the Notty. When the Bear directed the Notty to heave to, the Notty increased speed and attempted to evade the Coast Guard Cutters and air surveillance. During the high-speed chase that followed, Coast Guard personnel observed the crew of the Notty throwing packages overboard as the Notty maneuvered in a zig-zag pattern. The Tampa moved into position and fired warning shots in front of the Notty, but the Notty proceeded to use evasive maneuvers for approximately

twenty more minutes. Eventually, the <u>Notty</u> stopped and a Coast Guard party from the <u>Bear</u> boarded the vessel.

McPhee and two other co-defendants, Darron Lloyd Rolle and Dave Mario Williams, were found aboard the <u>Notty</u>. Although all three claimed Bahamian nationality and the master of the <u>Notty</u> claimed that the vessel was registered in the Bahamas, no registration was found on board the vessel. When inquiry directed at Bahamian authorities did not result in an affirmative and unequivocal assertion that the vessel was registered in the Bahamas, the Coast Guard deemed the vessel stateless, arrested the defendants, and brought them to Key West, Florida. The Coast Guard recovered a total of ninety-four bales of marijuana (weighing 2,092 pounds) which had been thrown overboard during the hot pursuit.

McPhee was indicted, along with the other two crew members, for conspiracy to possess marijuana with intent to distribute (Count One) and possession of marijuana with intent to distribute (Count Two) while on board a vessel subject to the jurisdiction of the United States, in violation of 46 U.S.C. app. §§ 1903(j) and 1903(a).[2] On October 30, 2001, McPhee and the co-

---

[2]These sections provide:

> (a) Vessels of United States or vessels subject to jurisdiction of United States
>
> It is unlawful for any person on board a vessel . . . subject to

defendants filed a joint motion to dismiss the indictment, challenging the government's assertion that the vessel upon which they had been apprehended was subject to the jurisdiction of the United States. They claimed, in essence, that the Notty had never left the territorial waters of the Bahamas and, therefore, that the United States did not have authority to arrest them. (McPhee and his co-defendants did not dispute that the Bahamian government could not verify that their vessel was registered in the Bahamas.) The government responded, however, that the Notty was subject to American jurisdiction because it was "without nationality," that is, it was a "stateless vessel" that had been intercepted in international waters, and, that even if the vessel had been intercepted in Bahamian waters, the Bahamas and the United States had entered into an agreement that allowed the United States to exercise jurisdiction over stateless vessels located more than three miles from Bahamian land.

---

the jurisdiction of the United States . . . to knowingly or intentionally manufacture or distribute, or to possess with intent to manufacture or distribute, a controlled substance.
. . .
(j) Attempt or conspiracy

    Any person who attempts or conspires to commit any offense defined in this chapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

46 U.S.C. app. § 1903(a), (j).

5

Soon thereafter, on November 30, 2001, the district court conducted an evidentiary hearing on the motion to dismiss and, at the conclusion of the hearing, invited the parties to supplement their pleadings in support of their positions. On December 26, 2001, the district court denied the defendants' motion, finding that the Notty was indeed subject to the jurisdiction of the United States because it was a vessel without nationality seized in international waters, and that, in any event, the Bahamian Government consented to enforcement of American law by the United States in Bahamian territorial waters. See 46 U.S.C. app. § 1903(f) ("All jurisdictional issues arising under this chapter are preliminary questions of law to be determined solely by the trial judge."); see also Tinoco, 304 F.3d at 1111-12 (holding that 46 U.S.C. app. § 1903, which allows the court to decide whether the MDLEA's jurisdiction and venue requirements are met as a matter of law, does not violate defendant's due process or jury trial rights). After the denial of this motion, as noted, McPhee entered a conditional plea of guilty to Count One. This appeal ensued.

McPhee urges that the statutory requirements for subject matter jurisdiction imposed by 46 U.S.C. app. § 1903(c)(1)(E)[3] were not met because, at the time of

---

[3]Section 1903(c)(1)(E) provides: "[A] 'vessel subject to the jurisdiction of the United States' includes-- . . . (E) a vessel located in the territorial waters of another nation, where the nation consents to the enforcement of United States law by the United States." 46 U.S.C. app. §

6

the seizure, the Notty was located within the territorial of waters of the Bahamas, and, the Bahamian Government had not consented to the enforcement of American law by the United States in its territorial waters. We need only decide one issue today -- whether, at the time of seizure, the Notty was a stateless vessel located within international waters. Because we are satisfied that it was, the Notty was a vessel subject to the jurisdiction of the United States, and accordingly, we need not answer the more difficult questions of whether the Bahamian Government consented to the enforcement of American law by the United States in the territorial waters of the Bahamas, or whether the United States had jurisdiction to seize a stateless vessel without consent, within Bahamian territorial waters.[4]

---

1903(c)(1)(E).

[4]Section 1903(c) also provides in relevant part:

> (1) . . . [A] "vessel subject to the jurisdiction of the United States" includes--
>
> (A) a vessel without nationality;
> . . .
> (2) For purposes of this section, a "vessel without nationality" includes--
> . . .
> (C) a vessel aboard which the master or person in charge makes a claim of registry and the claimed nation of registry does not affirmatively and unequivocally assert that the vessel is of its nationality. . . .

46 U.S.C. app. § 1903(c)(1)(A), (2)(C).

7

In <u>United States v. Marino-Garcia</u>, we concluded that "international law permits any nation to subject stateless vessels on the high seas to its jurisdiction," and, consequently, that "all persons aboard vessels engaged in drug trafficking that [fail] to unmistakably accede to the authority of a single sovereign while traversing the high seas [are] subject to the criminal jurisdiction of the United States."[5] 679 F.2d 1373, 1383-84 (11th Cir. 1982); <u>see also</u> 33 C.F.R. § 2.05-1 (defining "high seas" (with exceptions not relevant here) as "all waters which are neither territorial seas nor internal waters of the United States or of any foreign country"); 33 C.F.R. § 2.05-5(b) (defining "territorial seas" of foreign countries as "waters within the belt that is adjacent to its coast and whose breadth and baseline are recognized by the United States"). The United States generally recognizes the territorial seas of foreign nations up to twelve nautical miles adjacent to recognized foreign coasts. <u>See</u> United States: Proclamation on an Exclusive Economic Zone, 22 I.L.M. 461, 462 (March 10, 1983) ("The United States will respect only those territorial sea claims of others in excess of 3 nautical miles, to a maximum of 12 nautical miles, which accord to the U.S. its full rights under

_____

[5]Lieutenant Walsh testified that a vessel must generally be "12 miles" from a foreign nation to be in international waters, although "[t]here are some countries that claim less than 12 miles." Testimony of Lieutenant Walsh before the district court (November 30, 2001), at 19. He explained that the Bahamas claims a twelve-mile territorial water boundary. <u>See</u> <u>id</u>.

international law in the territorial sea."); United States Ocean Policy, Statement by President Reagan, 22 I.L.M. 464, 464 (March 10, 1983) ("[T]he United States will recognize the rights of other states in the waters off their coasts, as reflected in the [United Nations Convention on the Law of the Sea], so long as the rights and freedoms of the United States and others under international law are recognized by such coastal states."); see also United Nations Convention on the Law of the Sea, Dec. 10, 1982, 21 I.L.M. 1245, 1272, Part II § 2, Art. 3 ("Every State has the right to establish the breadth of its territorial sea up to a limit not exceeding 12 nautical miles, measured from baselines determined in accordance with this Convention.").[6]

McPhee offers two arguments in support of his claim that the Notty was in Bahamian territorial waters at the time of its seizure and his arrest. First, he says that the district court clearly erred in finding the coordinates plotted by Lieutenant Thomas F. Walsh on the Tampa's navigation chart, Government Exhibit 1, to be the most accurate source of information regarding the position of the Tampa at the

---

[6]As explained by the Government, although the United States is not a party to the Convention, the Government "generally recognizes [the Convention] as customary international law apart from the deep sea-bed mining provisions." See Government's Suppl. Response in Opposition to Defendants' Motion to Dismiss, submitted to the district court on December 10, 2001, at 6; see also H.R. Conf. Rep. No. 107-777, at § 104 (2002) ("The United States, although not a party to the [Convention], has consistently maintained that specific provisions . . . represent customary international law.").

time the Notty was boarded. He suggests that the district court wrongly accepted the chart, which placed the Notty approximately 17 miles east of Cay Santo Domingo and in international waters at the time it was boarded, over two other sources of information about the Notty's location: the Law Enforcement Checklist, which placed the Tampa at a position three miles north of Cuba at that time;[7] and the Miami Command Center Chronological Phone Log, which placed the Tampa approximately ten miles north of the nautical chart position and within twelve miles of Cay Verde and Cay Santo Domingo, i.e., well within Bahamian territorial waters. Second, he argues that even if the Notty was not intercepted within twelve miles of a known Bahamian landmark, it was still in Bahamian territorial waters because it was within twelve miles of Saint Vincent Rock, which, he contends, is a Bahamian island from which Bahamian territorial waters radiate.

After thorough review of the record, we can find no clear error in the district court's determination that the navigation chart was the "most accurate source of information" as to the Notty's location at the time of its interception. At the evidentiary hearing, the Government offered the testimony of Lieutenant Walsh, Operations Officer and Navigator on the Tampa at the time of the interception. Lieutenant Walsh testified that Government Exhibit 1 was the chart that was on

_____

[7]At oral argument, McPhee conceded that this location was not accurate.

10

board the Tampa at the time of the pursuit of the Notty, and that the chart indicated that the Tampa was located "[j]ust over 17 miles east of Cay Santo Domingo," unambiguously in international waters at the time of its interception. He explained that it was his job to ensure that he was cognizant of the Tampa's position wherever it was on the high seas, and that late in the evening of April 30, 2001 and early morning of May 1, 2002, he plotted the Tampa's pursuit of the Notty according to coordinates provided by a "Global Positioning System" ("GPS") on the navigation chart. Walsh explained that a GPS "receives information from satellites . . . [which] is processed and that information is displayed . . . as numbers [that can be] transferr[ed] to [a] chart or [] map." He added that the boarding vessel and the Notty were "no more than 1,000 yards or half mile from [the] plotted position" of the Tampa at that time. When questioned about the different coordinates provided on the Command Center Phone Log, he explained that the information found in the Log is not accurate, as demonstrated by the fact that it indicates a position close to or in violation of standing orders "not [to] take the ship into water less than six meters." He also observed that the navigation chart indicates the accurate position because it was recorded on board the Tampa contemporaneously with the interception, while the Phone Log was prepared by

11

individuals in Miami based on coordinates transmitted to them via satellite from the Tampa.

McPhee argues, nevertheless, that the district court committed clear error in crediting the testimony of Lieutenant Walsh and the navigation chart. We disagree. "Under the clearly erroneous standard, we must affirm the district court unless review of the entire record leaves us 'with the definite and firm conviction that a mistake has been committed.'" United States v. Engelhard Corp., 126 F.3d 1302, 1305 (11th Cir. 1997) (quoting Anderson v. Bessemer City, 470 U.S. 564, 573, 105 S. Ct. 1504, 1511, 84 L. Ed. 2d 518 (1985)). Furthermore, "we allot substantial deference to the factfinder, in this case, the district court, in reaching credibility determinations with respect to witness testimony." EEOC v. Joe's Stone Crab, Inc., 220 F.3d 1263, 1285-86 (11th Cir. 2000) (citing Stano v. Butterworth, 51 F.3d 942, 944 (11th Cir. 1995) (holding that we defer even beyond clear error review to trial court findings relating to witness credibility determinations)). "As long as the district court's findings are plausible, we may not reverse the district court even if we would have decided the case differently." Englehard, 126 F.3d at 1305 (citing Anderson, 470 U.S. at 574, 105 S. Ct. at 1511). As the Supreme Court explained, deference to the district court is important to the proper functioning of the judiciary:

> The trial judge's major role is the determination of fact, and with experience in fulfilling that role comes expertise. Duplication of the trial judge's efforts in the court of appeals would very likely contribute only negligibly to the accuracy of fact determination at a huge cost in diversion of judicial resources. In addition, the parties to a case on appeal have already been forced to concentrate their energies and resources on persuading the trial judge that their account of the facts is the correct one; requiring them to persuade three more judges at the appellate level is requiring too much.

Anderson, 470 U.S. at 574-75, 105 S. Ct. at 1512.

McPhee has not pointed us to anything in the record demonstrating that the district court's findings were erroneous, let alone clearly erroneous. "'Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.'" Solomon v. Liberty County Comm'rs, 221 F.3d 1218, 1227 (11th Cir. 2000) (quoting Anderson, 470 U.S. at 574, 105 S. Ct. at 1511). Here, the district court was presented with a substantial body of evidence to support its finding that the navigation chart was the more reliable source for discerning the location of the Notty. As discussed, supra, Lieutenant Walsh testified that the most accurate way to determine the location of the Notty when it was apprehended was by using the Tampa's navigation chart from the time of the event, and that the Phone Log location could not be expected to be as accurate. McPhee offered precious little to contradict Lieutenant Walsh's testimony as to the precise geographic location of the Notty at the time of seizure.

13

McPhee also suggests, however, that he can prevail even if the navigation chart position is considered accurate, because the position it provides still places the Notty within Bahamian territorial waters and the Bahamian government did not consent to the enforcement of American law within its territorial waters.[8] This turns entirely on whether Saint Vincent Rock, which, according to the navigation chart, was located within twelve miles of the Notty at the time of the interception, is a "rock" or an "island" for the purposes of determining Bahamian territorial waters. If Saint Vincent Rock is a Bahamian "island" from which the twelve-mile Bahamian territorial boundary could radiate, then the Notty was within Bahamian territorial waters at the time of the interception; however, if it is a "rock," then the Notty was in international waters or at "high seas" at that time. Both sides agree that this determination must be made in accordance with the definition of "island" provided in The 1993 Archipelagic Waters and Maritime Jurisdiction Act of the Bahamas (the "Act" or the "Archipelagic Act").[9]

---

[8]McPhee does not dispute that if we find that the Notty was not within Bahamian territorial waters at the time of the interception, we need not reach whether the Bahamian Government had consented to the enforcement of American law by the United States as required by § 1903(c)(1)(E).

[9]The Government argued that the Notty was in international waters or on the "high seas" because "Saint Vincent Rock is a rock. If it was an island, it would be called Saint Vincent Island, not Saint Vincent Rock." Ultimately, we must determine whether it is a rock or an island according to the statutory definitions provided by the Archipelagic Act. We note in passing that for some purposes, the label is not altogether satisfying. Thus, for example, in the metaphysical sense, we can discern no reason why something could not be both a rock and an island at the same time. See Paul

The district court began its analysis by taking judicial notice of the fact that the Bahamas claims a twelve-mile territorial limit, and found that at the time of the interception the Notty was over twelve miles from Cay Santo Domingo, the closest Bahamian island.  See Archipelagic Act, at § 4(1), (3) ("The territorial sea of The Bahamas comprises those areas of the sea having as their inner limits the baselines described in this section and as their outer limits a line established seaward from those baselines every point of which is at a distance of twelve miles from the nearest point of the appropriate baseline . . . [in part defined as] baselines from which the breadth of the territorial sea of The Bahamas . . . measured [from] the low water line along the coast of each island.").  Applying the definitions provided in the Archipelagic Act, the district court determined that, "[h]aving heard the testimony of Lieutenant Joseph Kramek, having examined the chart marking depicting St. Vincent Rock, and having reviewed the Bahamian Archipelagic [Act], the Court concludes that St. Vincent Rock does not constitute an island for

Simon and Art Garfunkel, I am a Rock, on Sounds of Silence (Columbia 1966) ("A winter's day, in a deep and dark December.  I am alone, gazing from my window, to the streets below, on a freshly fallen silent shroud of snow.  I am a rock, I am an island. I've built walls, a fortress deep and mighty, that none may penetrate.  I have no need of friendship, friendship causes pain.  It's laughter and it's loving I disdain.  I am a rock, I am an island.  Don't talk of love.  Well I've heard the word before. It's sleeping in my memory.  I won't disturb the slumber of feelings that have died.  If I never loved, I never would have cried.  I am a rock, I am an island.  I have my books and my poetry to protect me. I am shielded in my armor.  Hiding in my room, safe within my womb, I touch no one and no one touches me.  I am a rock, I am an island.  And a rock feels no pain.  And an island never cries."). Of course, neither Simon nor Garfunkel has been identified as a nautical expert.

15

purposes of measuring the Bahamas' twelve-mile territorial limit." The district court's finding that Saint Vincent Rock is not an island is a finding of fact that we review for clear error. See Tinoco, 304 F.3d at 1114.

Contrary to McPhee's claim, the record is replete with evidence that Saint Vincent Rock is not a Bahamian island for the purposes of determining Bahamian territorial waters. In the first place, Lieutenant Walsh testified that Saint Vincent Rock is "not Bahamian territory" because the markings on the navigation chart, which identify Saint Vincent Rock, indicate "very shallow waters [and that there could be] rocks in the vicinity of the surface of the water."[10] This testimony was bolstered by the testimony of Lieutenant Joseph Kramek, an attorney with the United States Coast Guard, who explained that Saint Vincent Rock "is normally a

---

[10]Lieutenant Walsh testified in relevant part as follows:

> Q. [Government counsel] Now, somewhat to the northeast . . . there is an indication of Saint Vincent Rock, do you see that?
> A. [Lieutenant Walsh] Yes, sir, I do.
> Q. Are you familiar with whether or not that is a Bahamian territory or not?
> A. My understanding is that is not Bahamian territory.
> Q. What is the basis for that understanding?
> A. Based upon the symbol that is drawn on the chart.
> Q. And what is that symbol?
> A. It resembles a plus.
> Q. Okay. And what does that plus mean on nautical charts?
> A. There could be a possible -- very shallow waters. It could at times have rocks in the vicinity of the surface of the water.

Testimony of Lieutenant Walsh before the district court (November 30, 2001), at 44-45.

submerged rock [and therefore] would not qualify as land." He further explained that it does not satisfy the definition of "island" -- a naturally formed area of land which is surrounded by and above water at mean high-water -- in the Archipelagic Act § 2. He also explained that Saint Vincent Rock does not fit the definition of low-tide elevation under the Act § 4(5) ("a low-tide elevation is a naturally formed area of land which is surrounded by and is above water at mean low-water but is submerged at mean high-water") because "it is not a naturally formed barrier of land which is surrounded by above water, mean low water."[11] Furthermore,

---

[11]Lieutenant Kramek testified in relevant part in these terms:

> Q.    [Government counsel] On Government's Exhibit 1A [an enlargement of Exhibit 1], there is an indication Saint Vincent Rock. Do you see that?
> A.    [Lieutenant Kramek] Yes, I do.
> Q.    And are you familiar with the markings that indicate where Saint Vincent Rock is?
> A.    Yes, I am.
> Q.    And what do those markings mean?
> A.    That plus sign indicates that certain times that there may be rocks awash there. However, it is normally a submerged rock.
> Q.    And is that Saint Vincent Rock a territory claimed by the Bahamas?
> A.    No, it is not, sir. Since it is normally a submerged rock, it would not qualify as land and therefore you would not extend a territorial sea claim from that position[.]
> Q.    And are you familiar with the Bahamian law on how the Bahama claims -- or how the Bahamas defines territory -- its own territory?
> A.    Yes, sir, I am.
> . . .
> A.    . . . I am reading from the Bahamian Archipelagic Waters and Maritime and Jurisdiction Act of 1993, which is essentially

17

McPhee submitted nothing to support a finding that Saint Vincent Rock lies within the breadth of the Bahamian territorial sea and, therefore, no support for his position that it fits the definition of the Act § 4(4) ("Where a low-tide elevation lies wholly or partly within the breadth of sea which would be the territorial sea of The Bahamas if all low-tide elevations were disregarded for the purpose of measurement of the breadth thereof, the low-tide elevation shall be treated as an island.").

Other record evidence also supports the district court's finding. When the navigation chart and Chart No.1, United States of America Nautical Chart -- Symbols Abbreviations and Terms (10th ed. 1997) ("Chart No. 1") are read together, they indicate that Saint Vincent Rock is a rock and not an island.

---

the Bahamian statute on how they define their territorial sea claims.
And in the definition[] section, which is on page 2, paragraph 2, the word "island" means a naturally formed area of land which is surrounded by and above water at mean high water.

Q.    And based on that definition, does Saint Vincent Rock qualify as a Bahamian territory?
A.    No, it does not, sir.
. . .
Q.    You testified that at times Saint Vincent Rock is awash. Why is it that it does not fit the definition of low tide elevation?
A.    It doesn't fit the definition of low tide elevation because it is not a naturally formed barrier of land which is surrounded by above water, mean low water.

Testimony of Lieutenant Kramek before the district court (November 30, 2001), at 46-48, 52.

Specifically, the navigation chart indicates the presence of Saint Vincent Rock with a plus sign encircled by dashes, which, according to <u>Chart No. 1</u>, represents a "[d]angerous underwater rock of uncertain depth." <u>See</u> <u>Chart No. 1</u>, at 43.

On this unambiguous record, we conclude that the district court did not clearly err in finding that the <u>Notty</u> was a stateless vessel found in international waters at the time of its interception by the United States Coast Guard. Accordingly, the <u>Notty</u> was a vessel subject to the jurisdiction of the United States and we affirm.

**AFFIRMED.**