[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 07-15666
Non-Argument Calendar

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 1, 2008
THOMAS K. KAHN
CLERK

D. C. Docket No. 04-01380-CV-JEC-1

JONATHAN O. MADU,

                                                    Plaintiff-Appellant,

                          versus

MICHAEL CHERTOFF,
Secretary of the Department
of Homeland Security,
MICHAEL ROZOS,
Interim Director, Atlanta Bureau
of Immigration and Customs Enforcement,
ROSEMARY MELVILLE,
Director, Atlanta District U.S. Citizenship
and Immigration Services,

                                                    Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

**(July 1, 2008)**

Before ANDERSON, BIRCH  and HULL, Circuit Judges.

PER CURIAM:

Jonathan O. Madu appeals the district court's denial of his 28 U.S.C. § 2241 petition for a writ of habeas corpus[1], which alleged that the deportation order that formed the basis for his current detention never came into being because he departed the country voluntarily within the time permitted, i.e., before 5 June 1987. On appeal, Madu argues that the district court clearly erred in denying his § 2241 petition because a preponderance of the evidence established that he departed to Mexico before 5 June 1987.  After review, we find that the district court did not clearly err in determining that Madu did not show by a preponderance of the evidence that he had departed the country prior to 5 June 1987, because the evidence presented by Madu was unauthenticated and incomplete.  Accordingly, we AFFIRM.

## I.  BACKGROUND

On 17 May 2004, Madu, a Nigerian citizen, filed a petition for a writ of habeas corpus in the U.S. District Court for the Northern District of Georgia,

---

[1] As an initial matter, Madu may proceed before us despite the lack of a Certificate of Appealability ("COA").  Under 28 U.S.C. § 2253(c)(1), a COA is required in a habeas proceeding when "the detention complained of arises out of process issued by a State court," or the proceeding was pursuant to § 2255.  By negative implication, a habeas proceeding involving a federal detention complained of under § 2241 does not need a COA to appeal.  See 28 U.S.C. § 2253(c); Sawyer v. Holder, 326 F.3d 1363, 1364 n.3 (11th Cir. 2003).

2

pursuant to 28 U.S.C. § 2241, alleging that his detention and imminent deportation by the Department of Homeland Security ("DHS") was illegal. Specifically, Madu argued that his arrest by the DHS, pursuant to an order of deportation from 1987, violated his due process because he had actually voluntarily departed the United States before the order was issued. Madu also filed an emergency motion to stay deportation while his petition was pending, which the district court granted.

After several filings by the parties, the district court summarized the dispute as "whether [Madu] is subject to a final order of removal," noting that either he departed the country as he claimed and no order went into effect or he did not leave the United States and is subject to removal. R2-21 at 9. The court therefore determined that Madu was challenging a final order of removal and found that the REAL ID Act divested it of jurisdiction, and it transferred the action to us.

We held that Madu was not challenging a final administrative order of removal because the question presented in the case was whether there was there was a removal order at all. Madu v. U.S. Atty. Gen., 470 F.3d 1362, 1367 (11th Cir. 2006). Therefore, the district court retained jurisdiction under § 2241 to hear Madu's habeas petition. Id. We vacated the district court's order transferring the case and remanded it to the district court for habeas proceedings, including an evidentiary hearing, to determine whether Madu complied with the voluntary

3

departure order by leaving the country. Id. at 1368.

At the district court's evidentiary hearing, Madu testified and submitted documentary evidence. Priscilla Sterling-Madu testified that she married Madu in 1984, they divorced in 1985, and then later remarried. She said that Madu went to Mexico in 1987 because he had to leave the country by June 5th of that year. R3 at 57. She let him take their son to make sure he would come back, but immediately explained that she allowed Madu to take their son "just to make it easy for him to get a visa to come back." Id. at 57-58. She did so although they were not married at the time and, in fact, she was married to someone else. Id. at 57, 59-60. A friend took Madu and her son to the airport, and Madu called her from Mexico. Id. at 58-59. Madu and his son rode a bus back from Mexico. Id. at 59. Onyema Joe Maduabuchi, Madu's son, testified that he went to Mexico with his father. Id. at 68. Although he was only two years old, he remembered bits and pieces of the trip, and knows "for a fact" that he went to Mexico. Id. The government then presented the testimony of Terry Bird, chief counsel for Immigration and Customs Enforcement ("ICE") in Atlanta, Mark Lee Johns, acting assistant field officer director for the Department of Immigration, and Mildred Ellis, an immigration officer for DHS.

Following the evidentiary hearing, the district court entered a written order

4

denying Madu's § 2241 petition and dismissing his case. The court first determined that it would review the evidence presented de novo to decide whether Madu had established that he had traveled to Mexico before 5 June 1987, by a preponderance of the evidence. The court first found that Madu had shown himself to be willing to "game" the immigration system and that he had a strong interest to lie in this case, but it noted that it was not focusing on these findings in its determination that Madu had not traveled to Mexico, but, instead, that determination was based on the circumstances surrounding the alleged trip and the corroborating evidence. R2-36 at 20. The court then noted that Madu's credibility was hurt by the fact that he had a felony conviction for making false statements to obtain student assistance, but noted that in determining his credibility, the court relied more on the specific plausibility of his story and his demeanor on the stand. Id. at 20-21.

Based on the improbability of Madu's story and his demeanor on the stand, the court found Madu's testimony that he traveled to Mexico unbelievable. Specifically, the court found the details regarding his reentry into the United States to be implausible because, according to Madu, his passport bore a stamp denying a visa from the U.S. embassy in Mexico, and Bird had testified that border agents would not have allowed Madu into the country under the circumstances. Id. at 22.

Next, the court found that Madu's failure to create reliable documentary evidence of his trip to Mexico was at odds with his purpose of the trip and the trouble he would have gone through in traveling, although the court recognized that he was not under an obligation to have created a record of such evidence. Id. at 22-24. The court also determined that it would have been reasonable for Madu to inform INS that his travel plans had changed and that he would travel to Mexico instead of Nigeria in order to avoid the entry of a deportation order, which his testimony shows he knew would occur if he did not actually depart. Id. at 24-25. Additionally, the court noted that Madu's explanation that he lost his passport in a tornado was "convenient," and did not believe him on that point. Id. at 24 n.10.

The court then found the testimony of Madu's wife to be of limited value because she did not see him board a plane for Mexico and the phone call she received could have come from anywhere. Id. at 25. The court also found that it could not credit the testimony of Madu's son because he was only two-and-a-half years old when the trip allegedly happened, and research has shown that individuals are unable to remember events that occurred before the age of approximately three-and-a-half. Id. at 25-26. Therefore, his son may have been convinced by his father that he traveled to Mexico, and he might think he remembers traveling there, but his testimony was not probative on the fact. Id. at

6

26.

The court then addressed Madu's documentary evidence. First, the court noted that Madu never offered his original passport, and found that since the lawyer who certified the copies did not testify at the hearing or present a statement regarding the document, the document was not persuasive, especially considering the ease with which the copies could have been falsified "with a pair of scissors, cellophane tape, and a photocopy machine[.]" Id. at 26-27. The court noted that a Google search of the supposedly authenticating lawyer's name indicated that he now practiced law in Washington, D.C. Id. at 27 n.12. The court also found that the government refuted Madu's claim that the INS must have accepted the copies by showing that the only requirement for getting a work permit was submitting an application. Id. at 27. The court observed that the remaining documents demonstrated, at most, that someone had at some unspecified time planned a trip to Mexico. The court noted that Madu had only submitted the copies of his passport with his original application to stay deportation, and found that the fact that the other evidence was presented only later further indicated that the documents were not credible. Finally, the court determined that the absence of evidence that Madu attempted to notify officials that he had actually left the country rendered his evidence less credible, even though he was not required to do so. Having found

7

that Madu did not establish by a preponderance of the evidence that he traveled to Mexico before 5 June 1987, the court concluded that the order of deportation was still in effect.

## II. DISCUSSION

On appeal, Madu argues that the district court clearly erred in denying his § 2241 petition. He contends that a preponderance of the evidence established that he departed to Mexico before 5 June 1987. Although he could not present his original passport, he claims to have obtained copies that were kept by the INS itself. He argues that the passport copies, along with the testimony of his wife and son and the documentary evidence, all established that he traveled to Mexico on 18 May 1987. Madu contends that the district court was determined to reject the petition, and ignored evidence that his passport was authentic and offered insufficient reasons to reject his testimony, the testimony of his wife and son, and his documentary evidence. In rejecting his passport, he claims that the court ignored the evidence that showed that the copies were reliable, including the facts that the copies were obtained from the INS as part of an application he made in 1990, long before the present proceedings, and they bore the certification of an officer of the court, even if the INS never examined it at that time. Additionally, although the court dismissed his story that his passport was destroyed by a tornado,

Madu notes that the record included a letter from FEMA for disaster assistance, although the letter was not presented at the hearing. He also argues that the court was also incorrect in dismissing his testimony regarding his reentry because it is an open secret that the U.S.-Mexico border is porous, and incorrectly relied on evidence of his 1993 conviction as its probative value did not substantially outweigh its prejudice. Madu contends that the court did not cite a valid reason to discount his former wife's testimony, and the fact that on average a child does not remember events occurring before the age of three-and-a-half does not mean that his son did not remember traveling to Mexico, and the study the district court cited was not in the record. He claims that, due to the tornado, it was not surprising that the documentary evidence was fragmented or that it was not discovered right away.

"In reviewing the district court's denial of a habeas corpus petition, we review questions of law de novo and the court's findings of fact for clear error." Coloma v. Holder, 445 F.3d 1282, 1284 (11th Cir. 2006) (per curiam) (quotation and citation omitted). "A petitioner has the burden of establishing his right to federal habeas relief." Id. (quotation and citation omitted). As long as the district court's findings are plausible, we will not reverse the district court even if we would have decided the case differently. United States v. McPhee, 336 F.3d 1269, 1275 (11th Cir. 2003) (quotation omitted). Finally, "we allot substantial

deference" to the credibility determinations of the finder of fact. Id. (quotation omitted). The only issue involved in this case is the factual determination of whether Madu actually left the United States for Mexico before 5 June 1987. See Madu, 470 F.3d at 1368.

Here, Madu did present evidence that tends to indicate that he traveled to Mexico City at some point. Most important for his case are the copies of his passport obtained from the INS. See R.Exh., Pl.'s Exh. 2. If authentic, these copies would conclusively show that he traveled to Mexico City before 5 June 1987, as there is a stamp from the U.S. embassy in Mexico City bearing the date of 20 May 1987, which was consistent with the practice of an embassy when dealing with a visa application. R3 at 107-08. These copies purport to be certified by an officer of the court, as they were stamped by Madu's lawyer at the time. Furthermore, although the district court dismissed Madu's story regarding a tornado destroying his original passport, the record did contain evidence that he was the victim of a natural disaster sometime in 1998. R1-7 at Exh. B. Madu also presented the testimony of his son, who said that he knew for a fact that he had traveled to Mexico City with his father, R3 at 68, and his wife, who said that a friend dropped Madu off at the airport and that Madu called from Mexico to report that he had not obtained a visa. Id. at 58-59. Although the district court dismissed

10

the testimony of Madu's son because, on average, children do not remember events before they are roughly three-and-a-half years old, just because three-and-a-half is the average age of memory-forming does not mean that Madu's son could not have remembered what would have been a particularly memorable event a year before average. Finally, Madu also presented several documents that, when added together, seem to show that he did travel to Mexico at some point with his son, see R.Exh., Pl.'s Exhs. 1, 3-9, although not necessarily before 5 June 1987.

However, considering the weaknesses of Madu's evidence, the demanding standard of review, and the fact that much of the case hinges on determinations of credibility, we are persuaded that the judgment of the district court is due to be affirmed. First, regarding Madu's passport, although the copies came from the INS and had been in its possession for a long time, R3 at 138, testimony established that the copies would not have been examined in order to issue Madu a work permit, but rather the application itself was all that was required. Id. at 142-43. Moreover, although Madu testified that he presented the original and the INS made copies of his passport, which his lawyer certified, id. at 23, 30-31, 34, that procedure was not consistent with the practice of the INS, which would have certified the copies itself. Id. at 89-91. Even though sending in copies was an accepted practice for applications, an original would eventually be required, id. at

11

102-03, 105-06, 144, 148-49, and the INS's records did not indicate that anyone there had ever actually seen Madu's passport. Id. at 89-91. Finally, although the copies purported to be authenticated by Madu's then-lawyer, that individual did not testify or present a statement verifying his signature. See R.Exh., Pl.'s Exh. 2. This fact is especially important considering it was Madu's burden to establish that he had actually traveled to Mexico and, therefore, the authenticity of the document. See Coloma, 445 F.3d at 1284.

The district court placed heavy weight on the fact that it found Madu's story regarding his reentry back into the United States implausible. Madu argues that this conclusion was improper because it is well known that the United States-Mexico border is porous. Whether or not that statement is accurate, Madu did not state that he was able to sneak through the border or that he was not asked for proper documentation. Instead, he testified that he presented his Nigerian passport and was allowed to pass through without question even though his passport bore a stamp showing he applied for a visa, yet he did not have one. See R3 at 26-28; R.Exh., Pl.'s Exh. 2. Bird testified that such a scenario was unlikely, even when traveling with a U.S. citizen child with a U.S. passport. R3 at 87-89. Therefore, the district court's determination that Madu's story regarding his reentry was not credible is due deference. See McPhee, 336 F.3d at 1275.

12

Madu challenges the district court's decision to afford little, if any, weight to the testimony of his wife and son and the additional documentary evidence he presented. However, with the possible exception of his son's testimony, this evidence sheds little, if any, light on the issue. First, his wife had no direct knowledge of Madu's alleged trip because she did not take him to the airport or see him board a plane, and the phone call she received from him could have been placed from anywhere. See R3 at 57-59. Next, the additional documentary evidence provided by Madu does seem to show that at some point he traveled to Mexico City with his son, but, except for a postcard that was never mailed, none of the documents bears any date and, therefore, they are of little or no probative value on the issue of whether he traveled to Mexico City before 5 June 1987. See R.Exh., Pl.'s Exhs. 1, 3-9. Although his son testified that he knew "for a fact" that he had been to Mexico City, R3 at 68, he did not establish when the trip occurred and, in fact, his testimony was unclear whether he knew for a fact that he had gone because he remembered the trip or because he had been told by his father that he had gone. Id. at 67-68. Finally, even if, as Madu asserts, the fact that the family's apartment was damaged by a tornado six years before he submitted his application to stay deportation helps to explain why his documentary evidence is fragmented, Madu had ample time to collect the documents that remained before he submitted

13

his application. Therefore, the court understandably considered the fact that the supporting documents were not submitted to the INS to be suspicious. R2-36 at 28; see McPhee, 366 F.3d at 1275.

Madu also challenges the district court's reliance on certain facts, including his previous arrest for false statements and the fact the court's determination that he was willing to "game" the immigration system. However, the district court specifically noted that although these facts tended to discredit Madu's testimony, it would consider them only minimally or not at all in reaching its decision. R1-36 at 19-21. On the other hand, the court noted that it was relying heavily on Madu's demeanor on the witness stand. Id. at 21. We afford such determinations substantial deference. See McPhee, 336 F.3d at 1275.

### III. CONCLUSION

In light of the foregoing, Madu has not established that the district court clearly erred in making the factual determination that he did not depart the United States before 5 June 1987, especially considering that he bears the burden of proving his eligibility for habeas relief, there is a demanding standard of review, and much of the court's determination was based on credibility determinations that are entitled to substantial deference. Accordingly, we AFFIRM.

**AFFIRMED**.