[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 16-17316
Non-Argument Calendar
_____

D.C. Docket No. 1:12-cr-00408-TCB-JSA-2

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

DEXTER JACKSON,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia
_____

(August 8, 2017)

Before HULL, MARTIN, and ANDERSON, Circuit Judges.

PER CURIAM:

Dexter Jackson appeals the revocation of his supervised release and imposition of a 12-month prison sentence, pursuant to 18 U.S.C. § 3583(e)(3).  The district court revoked Jackson's supervised release after finding that the government had shown, by a preponderance of the evidence, that Jackson, a 50-year-old man, had committed the crimes of child molestation and enticing a child for indecent purposes by kissing an eight-year-old girl on multiple occasions.  After careful review, we affirm.

## I.  BACKGROUND

### A.  Conviction and Supervised Release

In 2013, Jackson pled guilty to conspiracy to commit bank fraud.  In February 2015, after serving a 30-month prison sentence, Jackson was released and began his five-year term of supervised release.  As a condition of his supervised release, Jackson was prohibited from committing another federal, state, or local crime.

### B.  Violation Report

In May 2016, Jackson's probation officer filed a violation report and a petition for a warrant.  The report alleged that Jackson had violated the law by committing the offenses of (1) child molestation, in violation of O.C.G.A. § 16-6-4, (2) enticing a child for indecent purposes, in violation of O.C.G.A. § 16-6-5, (3) criminal trespass, in violation of O.C.G.A. § 16-7-21, and (4) loitering and

2

prowling, in violation of O.C.G.A. § 16-11-36.  The report also alleged that

Jackson had violated special conditions of his supervised release by failing to make

restitution payments and by testing positive for marijuana on three occasions.

Based on the child molestation and child enticement allegations, the district

court issued a warrant for Jackson's arrest.

## C.    Revocation Hearing

At Jackson's November 2016 revocation hearing, the restitution violation

was not at issue, and Jackson did not dispute the drug-use violations or the offenses

of criminal trespass and loitering and prowling.  Thus, the molestation and

enticement charges were the only allegations disputed at the hearing.  Because

defendant Jackson challenges the sufficiency of the evidence as to those

allegations, we detail the evidence produced at the 2016 revocation hearing.

### 1.  Mindy Paylor and the Videotaped Interview

At Jackson's revocation hearing, the government first called Mindy Paylor, a

forensic interviewer at the Georgia Center for Child Advocacy, to testify.  As part

of her job, Paylor conducted interviews of children who reported physical or sexual

abuse for use in law enforcement investigations.  Paylor testified that she had

conducted 125 forensic interviews of children throughout her career, and she had

received training about how to interview child victims and assess their credibility.

3

In May 2016, Paylor interviewed the child victim in this case. Paylor described the interview process and described "factors" that, in her experience, tended to demonstrate truthfulness during an interview, including consistency, details, and clarifying statements.[1]

The government then played the video recording of Paylor's interview with the child victim. In the interview, the child told Paylor that she had experienced child abuse, which she defined as "[w]hen somebody does bad things to you." The child told Paylor that Jackson—the boyfriend of her former babysitter, Tracy Blackmon— would pick her up from school and would start kissing her. The child stated that this happened three times and that the last time Jackson put his tongue in her mouth. The child then detailed what happened on each of those three occasions.

The first time, Jackson picked her up from school, and she sat by herself in the back seat of his car. When the child had difficulty buckling her seat belt, Jackson pulled over in front of a day care, got out of the car, and came to the back door. Jackson opened the door, the child told Jackson that she had already buckled her seat belt, and Jackson then leaned in and kissed her on the lips. Jackson did not kiss her anywhere other than on the lips. Paylor asked if Jackson picked her up

---

[1]The district court did not allow Paylor to give an opinion about whether or not the child victim was telling the truth during the interview. See Snowden v. Singletary, 135 F.3d 732, 737-39 (11th Cir. 1998) (holding that an expert witness's testimony bolstering the credibility of a child victim was improper and denied the defendant due process).

4

from school three times, the child corrected her and said that Jackson picked her up many times but only kissed her three times.

As to the second time, Jackson picked the child up from school, and they drove to a Big Daddy's restaurant to pick up some food for Blackmon. They parked, and Jackson told the child, "I missed you, you gonna give me a kiss?" Jackson then leaned over the armrest to kiss her as she sat in the back seat.

As to the third time, Jackson and the child were sitting in the car at the corner by Blackmon's old house—the child said Blackmon had since moved—and Jackson leaned over the armrest again, kissed her, and put his tongue in her mouth. The child said she could not remember what it felt like when Jackson put his tongue in her mouth.

The child told Paylor that these three incidents occurred during her fourth-grade year, when she was still eight years old, and prior to her ninth birthday on October 30, 2015.

Paylor then asked the child about whether Jackson had ever done anything else to her:

> Q:    Did [Jackson] do anything else bad to you?
> A:    No.
> Q:    I know he did – you said he kissed you on your lips. Did he make you do anything to his body?
> A:    No.
> Q:    Did he ever show you any parts of his body?
> A:    No.
> Q:    Did he ever ask to see parts of your body?

5

A:    No.
Q:    Did he ever see parts of your body?
A:    No.

The child explained that she eventually told her mother about the abuse after she was in the shower and was thinking of how she missed her old babysitter, Blackmon, and this made her think of what Jackson had done.  Her parents called the police.

When Paylor resumed her testimony after the video was played, Paylor stated that the child's story was consistent, detailed, and she was able to make clarifying statements.  For example, the child was able to correct Paylor on certain points, although Paylor admitted on cross-examination that the child's clarifying statements were related to background information (such as the spelling of a name), not to Jackson's alleged conduct.  The child was also able to give details, such as the type of car Jackson drove—a black Dodge truck—and where they were when the kissing incidents occurred.

On cross-examination, Jackson's lawyer pointed out that, according to the police reports, the child had previously alleged that Jackson had asked to see her private parts.  Paylor agreed that, during the interview, the child told her that Jackson did not ask to see her private parts and that he did not show the child his private parts.  Paylor also agreed that there was a six or seven-month delay

6

between when the alleged incidents occurred (in the fall of 2015) and when the child reported them (in April or May of 2016).

On re-direct examination, Paylor testified that it would be unusual for a non-family member to kiss a child on the mouth and that building up to more and more sexual activity could be part of a sex offender "grooming" a child. Paylor also stated that there were many reasons that a child might delay reporting abuse and that in her experience there was a reporting delay about 60-70% of the time.

2. Jason Griffith

The government then called Jason Griffith, Jackson's probation officer. Griffith stated that he received an alert about the state's investigation of Jackson, and he then obtained the police reports. The government entered the police reports into evidence. Griffith confirmed that, according to the initial police report, the officer spoke to the child's mother, Erie Jenkins, who reported to the officer what her daughter had told her—Blackmon's boyfriend had picked the child up from school without the mother's knowledge and would kiss the child "and ask to see her private areas." The police report listed the perpetrator as Lester, Jack or Dexter Jackson. The mother later confirmed that the alleged perpetrator was Dexter Jackson.

Jenkins told the police that her daughter told her of the abuse after Jenkins began talking about her daughter going back over to Blackmon's house. The child

said the reason she did not come forward sooner was a fear that her parents would get in trouble.

Before Griffith was alerted by law enforcement, Jackson called Griffith to report that he had been "accused of kissing a little girl."   Jackson admitted to Griffith that he had picked the girl up from school but was adamant that he had not kissed, abused, or molested the child in any way.

Griffith acknowledged that there were inconsistencies between the police reports and the child's interview, including whether or not Jackson asked to see the girl's private parts and why the girl eventually reported the abuse to her mother.

### 3.  Erie Jenkins

The government called Jenkins, the child victim's mother, as its last witness. Jenkins explained that, from approximately January 2015 until October 2015, Blackmon cared for her daughter after school until Jenkins came home from work. This arrangement ended in October 2015 because Jenkins found a neighbor to care for her daughter.  Jenkins also testified that, in April 2016, she was considering sending her daughter back to Blackmon.  Jenkins said that she either told her daughter that she had the option of going back to Blackmon for after-school care or her daughter overheard her talking about that possibility.

On April 18, 2016, the girl came to Jenkins after dinner and asked to speak to her in private.  The girl told her mother that she missed Blackmon, but she was

8

"thinking about what happened when I was going over there." Jenkins asked her daughter what happened. The child replied that Blackmon's boyfriend would kiss her on the lips and put his tongue in her mouth. When Jenkins asked her daughter if "anything else" happened, the child said no. Jenkins asked if the boyfriend touched her private parts, and the child said no but that "sometimes he would want to see her private parts." The girl told Jenkins that it happened three times, once across the street from a day care, once in front of Big Daddy's restaurant, and once a "few houses away" from Blackmon's home. Jenkins then called the girl's father and the police.

Jenkins asked her daughter when these incidents happened, and the girl said it was from the beginning of the previous school year (in 2015) until October 2015. Jenkins asked why she did not say something sooner, and her daughter said she was scared her parents would get in trouble or go to jail. Jenkins stated that Jackson picked up her daughter from school without her knowledge and that Blackmon never mentioned to her that Jackson would help babysit the child.

After the government's case was complete, Jackson called three character witnesses—Blackmon, Melody Booker, and Nichaka Towns—and an investigator.

4. Tracy Blackmon

The defense called Blackmon, the former babysitter, as its first witness. Blackmon stated that Jackson lived with her in her house along with her daughter

9

and her nine-year-old granddaughter.  Blackmon stated that Jackson used her car, a black Dodge Journey, to go to work and fulfill probation responsibilities and that he had sometimes picked up the child victim from school in that car because Blackmon could not leave the house.  Blackmon acknowledged that she never told Jenkins that Jackson was regularly picking up the child from school.

Blackmon testified that she knew and trusted Jackson and so did her children and grandchildren and that she never saw anything suggesting that Jackson did anything to any of the children in the house.  Blackmon remembered when Jackson picked up food from Big Daddy's with the child victim in the car, but she did not notice either Jackson or the child behaving unusually then or at any other time. Blackmon stated that she asked her nine-year-old granddaughter if Jackson had ever done anything to her or made her uncomfortable, and the granddaughter said no.  Blackmon said that, when the child victim's father called and accused Jackson of kissing the child, Jackson adamantly denied doing anything.

On cross-examination, Blackmon said that she and Jackson had never had any "bad interactions" with the child victim, and she did not think that the child victim would lie to the police to get Jackson in trouble.  She also admitted that there were always people in the house so that if Jackson wanted to be alone with a child, probably the only place he could do so was the car.

5.  Melody Booker and Nichaka Towns

10

Melody Booker was a long-time friend of Jackson's who was in a previous relationship with him. Booker testified that Jackson stayed with her for five months after he was released from prison. Booker said that there were many children who spent time at her house during that period, but there were never any problems with Jackson and the children. Booker generally testified regarding Jackson's good character and stated that she had never seen or heard of him doing anything bad to a child and did not think that he would do such a thing.

Nichaka Towns also lived in the Booker household at the same time as Jackson. Towns testified that Jackson was around a lot of children and did not engage in any sexual misconduct.

### 6. Jordan Dayan

Finally, the defense called Jordan Dayan, a staff investigator at the Federal Public Defender's Office in Atlanta who worked on Jackson's case. Dayan authenticated photos of himself in the Dodge Journey at issue, demonstrating the difficulty of trying to reach from the front seat to the back seat. On cross-examination, Dayan testified that he was 5'11" tall and that he was unaware how tall Jackson was.

### 7. Revocation

After the government and Jackson presented their arguments, the district court emphasized that the relevant standard was preponderance of the evidence.

11

The district court expressly found that it was more likely than not that the child victim told the truth about the incidents. On November 15, 2016, the district court therefore revoked Jackson's supervised release and sentenced him to 12 months' imprisonment (with credit for time already served) followed by 18 months' supervised release.[2]

Jackson timely appealed.[3]

## II. DISCUSSION

Defendant Jackson contends that the government failed to prove by a preponderance of the evidence that he committed the crimes of child molestation and enticement. Specifically, he attacks the credibility of the child victim, calling her accounts "uncorroborated, inconsistent, inaccurate, and implausible."

A district court may revoke a term of supervised release if the court finds by a preponderance of the evidence that the defendant violated a condition of his supervised release. 18 U.S.C. § 3583(e)(3); see also United States v. Sweeting, 437 F.3d 1105, 1107 (11th Cir. 2006) (per curiam). The preponderance of the

---

[2]According to the Federal Bureau of Prisons's website, Jackson has already completed his 12-month sentence and was released from prison on May 5, 2017. See https://www.bop.gov/inmateloc/.

[3]The district court's written order did not specify which of Jackson's many violations supported the revocation of Jackson's supervised release. On appeal, the parties only dispute the sufficiency of the evidence as to the molestation and enticement allegations. Because we conclude that the district court did not abuse its discretion in revoking Jackson's supervised release based on the molestation and enticement allegations, we need not address the other violations—including drug violations and the criminal trespass and loitering offenses—that Jackson does not dispute.

evidence standard is met if it is more likely than not that the defendant violated a condition of his supervised release.  See United States v. Cataldo, 171 F.3d 1316, 1321-22 (11th Cir. 1999) (discussing the preponderance standard as it is applied to establishing a factual basis of a sentence).

We review a district court's decision to revoke a term of supervised release for an abuse of discretion.  United States v. Frazier, 26 F.3d 110, 112 (11th Cir. 1994).  Furthermore, we are bound by a district court's findings of fact unless they are clearly erroneous.  United States v. Almand, 992 F.2d 316, 318 (11th Cir. 1993).  Credibility determinations are the province of the factfinder, and ordinarily we will not review such a determination.  United States v. Copeland, 20 F.3d 412, 413 (11th Cir. 1994) (per curiam).  A district court's credibility determination must be accepted unless it is "contrary to the laws of nature, or is so inconsistent or improbable on its face that no reasonable factfinder could accept it."  United States v. Ramirez-Chilel, 289 F.3d 744, 749 (11th Cir. 2002).

Under Georgia law, a person commits child molestation when he or she "[d]oes any immoral or indecent act to or in the presence of or with any child under the age of 16 years with the intent to arouse or satisfy the sexual desires of either the child or the person."  O.C.G.A. § 16-6-4(a)(1).  A person commits the offense of enticing a child for indecent purposes when he or she "solicits, entices,

or takes any child under the age of 16 to any place whatsoever for the purpose of child molestation or indecent acts." Id. § 16-6-5(a).[4]

Here, the district court did not abuse its discretion in finding by a preponderance of the evidence that Jackson violated the conditions of his supervised release by committing the crimes of child molestation and enticing a child for indecent purposes. According to the government's evidence, Jackson picked up the child from school alone and without her mother's knowledge. While they were in the car, he kissed the victim, an eight-year-old girl, on three separate occasions, the last time putting his tongue in her mouth.

Although, as Jackson points out, the sole evidence supporting these allegations was the child's statements during her recorded interview, the district court found these statements to be credible. This determination was not so inconsistent or improbable on its face that no reasonable factfinder could accept it. Ramirez-Chilel, 289 F.3d at 749; see also United States v. Rodriguez, 398 F.3d 1291, 1296 (11th Cir. 2005) (explaining that a court's fact-finding based on a credibility determination "will almost never be clear error"). The evidence from the hearing showed that, during her interview, the child gave details of the abuse, made clarifying statements, and her recounting of the events was largely consistent

---

[4]Jackson does not argue on appeal that the acts he was accused of would fail to satisfy the elements of O.C.G.A. §§ 16-6-4 and 16-6-5. Rather, he argues that the child victim was lying and that the district court clearly erred in concluding, by a preponderance of the evidence, that the child was telling the truth and, thus, that revocation was appropriate.

14

with statements the child made later to her mother and with the other testimony offered at the hearing.

Jackson attacks the child victim's credibility on multiple fronts, arguing that: (1) the child victim made inconsistent statements regarding whether or not Jackson ever asked to see her private parts; (2) the child victim's statement that the third incident occurred near Blackmon's former home was materially inaccurate because Blackmon never moved; (3) the child victim's account was implausible because, as a large man, he could not have "leaned through the narrow opening of the arm rest" to kiss the child; and (4) while there could be "myriad reasons" why the child would fabricate a story about him, there was no other evidence from Jackson's past consistent with the allegations.

Some inconsistencies or small inaccuracies do not, however, render the district court's determination as to the child's credibility facially improbable or "contrary to the laws of nature." See Ramirez-Chilel, 289 F.3d at 749.  The child victim gave largely consistent statements to her mother, to the police, and to Paylor that Jackson kissed her three times after he picked her up from school, the last time placing his tongue in her mouth.  The child's recollection of the timing, location, and details of each incident remained the same in each account.  At best, Jackson has presented us with another permissible view of the evidence, one the district court rejected.  This is not enough to overturn the district court's fact findings and

15

decision.  See United States v. McPhee, 336 F.3d 1269, 1275 (11th Cir. 2003) (explaining that "we allot substantial deference" to the fact finder's credibility determinations and "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous" (internal quotation marks omitted)).

Given that the district court's credibility determination was not clearly erroneous, the evidence is sufficient to support a finding by a preponderance of the evidence that Jackson committed the crimes of child molestation and enticing a child for indecent purposes, in violation of O.C.G.A. §§ 16-6-4 and 16-6-5. Accordingly, the district court did not abuse its discretion when it revoked Jackson's supervised release.

**AFFIRMED.**